UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> JOHN HENDERSON and GLOBAL RESOURCES LEADERSHIP, LLC, <br><br> Defendants. | Civil Action No. 1:19-cv-06183 <br><br> Jury Trial Demanded |

## AMENDED COMPLAINT

The U.S. Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1. Between at least December 2016 and June 2017, Defendant John Henderson ("Henderson"), through his company Defendant Global Resources Leadership, LLC ("GRL"), conducted a series of unregistered and fraudulent offerings directed to the evangelical Christian community and the alumni of a Chicago-area Christian college. In both email and in face-to-face communications, Henderson solicited over 150 investors, inviting them to invest in various alleged ventures to buy and sell Nigerian crude oil. In these solicitations, Defendants made numerous false and misleading statements about Henderson's prior success in such oil and gas deals, GRL, GRL's joint venture partner, and the joint venture's relationship with various foreign countries and a purported Native American tribe (hereinafter, the "Tribe"), including but not limited to false statements regarding the Tribe's purported financial backing of the venture and supposed financial obligations of various African countries' governments. Defendants also made a series of misrepresentations regarding how GRL and Henderson would utilize any investment,

1

when, in reality, Henderson spent a significant proportion of the investor funds with which he was entrusted at various restaurants, bars, department stores, dentists, and on two Caribbean vacations.

2. The email and oral solicitations described various investment opportunities available to the potential investors, and Henderson provided and executed written "Trade Investment Agreements" with the individuals who invested, each of which stated how the relevant investment was to be spent and promised significant returns in short periods of time.

3. Defendant's June 30, 2017 e-mail solicitation targeted individuals associated with a Chicago-area Christian college, Christian church, and other religious organizations with which Henderson was associated, including a church he founded. When pitching his investment, Henderson often employed various religious references. For example, Defendant introduced the investment opportunity as "a Kingdom vision that is For Christ and His Kingdom" and stated he had "been led by the Spirit to do this."

4. Henderson's December 2016 and January 2017 in-person solicitation of Investor A, a resident of Missouri, resulted in an investment of $50,000 in January 2017.

5. Henderson's June 30, 2017 e-mail solicitation of Investor B, a resident of California, resulted in an investment of $10,000 in July 2017.

6. The agreements memorializing both Investor A's and Investor B's investments stated that the funds invested would be used to secure financial instruments necessary to facilitate the purchase of Nigerian crude oil. Henderson, however, spent large portions of both investors' investments on personal expenses.

7. Defendant Henderson committed fraud by knowingly or recklessly making materially false or misleading statements or omissions about the terms of the investments, which

he was soliciting, including about the financial backing of the venture and how investor funds would be used, and also by fraudulently misappropriating investor funds. GRL committed fraud through the acts of Henderson.

8. By engaging in this conduct, as further described herein, each of the Defendants directly or indirectly engaged in and, unless restrained and enjoined by the Court, will continue to engage in, transactions, acts, practices and courses of business that violate Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

9. None of the securities offered or sold by Defendants were registered with the Commission, nor are they eligible for any exemption from registration.

10. By engaging in this conduct, as further described herein, each of the Defendants also violated and, unless restrained and enjoined by the Court, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] by offering to sell, selling, and delivering after sales to the public, securities as to which no registration statement was or is in effect or on file with the Commission, and for which no exemption was or is available.

## JURISDICTION AND VENUE

11. The Court has jurisdiction over this action pursuant to Securities Act Sections 20(b) and 22(a) [15 U.S.C. §§ 77t(b) and 77v(a)] and Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Defendants made use of the means or instruments of interstate commerce, of the mails, or of the facilities of a national securities exchange in

connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

12. Venue lies in the Northern District of Illinois pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the acts, practices, and courses of business constituting the violations of law alleged in this Complaint occurred within this district. Specifically, (i) Defendant Henderson resides in this district; (ii) GRL's main office is located at Henderson's residential address in this district; and (iii) at least some of the solicited potential investors reside in this district.

## DEFENDANTS

13. **John Henderson,** age 67, is a resident of Naperville, Illinois. Henderson is the founder, owner, President, and CEO of Global Resources Leadership, LLC. Henderson is also the subject of a September 27, 2017, Georgia Department of Banking and Finance Cease and Desist Order and a related Default Judgment entered by the Superior Court of Banks County, Georgia.

14. **Global Resources Leadership, LLC** is a Delaware-incorporated limited liability company. Its principal place of business is at John Henderson's home address in Naperville, Illinois.

## FACTUAL ALLEGATIONS

### The Joint Venture Agreement

15. Defendant Henderson purports to be a pastor and claims to be active in charitable activities. Although he has no formal business training or experience in the commodities industry, Henderson started GRL after being inspired by stories of successful entrepreneurs. He envisioned GRL as a vehicle to generate funds for his charitable activities.

4

16.     In 2015, Henderson was introduced to Individual 1, a Nigerian national and resident of Georgia, and Individual 1's company (hereinafter, the "JV Partner"). Individual 1 is a bishop affiliated with churches in Nigeria and the United States. JV Partner purported to be engaged in the business of brokering the purchase of crude oil from the Nigerian National Petroleum Corporation ("NNPC") and selling that oil to refineries overseas. JV Partner effectively acted as a middle-man, to bring together the seller (NNPC) and buyers of oil.

17.     According to Individual 1, as part of the crude oil transactions he brokered, NNPC required that the buyer post a financial instrument or guarantee before the oil could be released, in order to provide insurance, and protect NNPC against loss, in the event the oil was not delivered to the buyer (e.g., if the vessel was lost at sea). That financial instrument had to be issued by a bank in the form of a letter of credit or similar guarantee. Individual 1 could not afford to fund the financial instrument on his own, and so he began efforts to raise money to facilitate the NNPC oil deals.

18.     After their introduction, Individual 1 and Henderson entered into a joint venture agreement through their respective entities, GRL and JV Partner, dated December 2015 and amended in July 2016 (the "JV Agreement"), for the purpose of brokering NNPC crude oil transactions. Pursuant to the JV Agreement, JV Partner, relying on Individual 1's contacts with NNPC, would procure the supply of crude oil. Under the JV Agreement, GRL would be responsible for raising and pooling money from U.S. investors, with the promise of exceptional returns, to fund the purchase of the financial instruments from banks.

**The December 2016 Securities Solicitation**

19. Defendants began soliciting investors to invest in GRL's purported oil deals as early as December 2105, including via a December 26, 2015 e-mail from Henderson to over 40 potential investors.

20. In or about December 2016, Henderson met in person with Investor A to discuss a possible investment in GRL.

21. After a series of e-mail communications following the December meeting, wherein Henderson told Investor A that her investment would be deposited into a "trust account" at a Wall Street bank and used to collateralize certain portions of an oil transaction Henderson reported to be facilitating, Henderson and Investor A entered into a written "Trade Investment" agreement on January 13, 2017.

22. The Trade Investment agreement provided as follows regarding GRL's and Henderson's use of Investor A's investment:

> For $50,000 in Trade investment lodged with Global Resources Leadership, LLC you will receive up to $8 million in one year, paid out at an average anticipated rate of $666,666.66 per month. First payment will be 30 days from the event where the MT799 is secured in the name of Global Resources Leadership in the JP Morgan Chase bank or other Prime Bank.
>
> The investment is made to purchase , for Global Resources Leadership, the ability to secure a Proof of Funds ( POF) for $100 million in a Trust account in Global Resources Leadership's name via a hedge fund using the JP Morgan Chase bank or Prime Bank . The POF will be set apart and used only to give confidence in a trade transaction to Sellers of Bonny Light Crude Oil in Nigeria who want to know they are dealing with real Buyers who have the ability to secure a MT799 for $100 million from a Prime Bank, thus partially proving up that we can complete a transaction for the full purchase price of the cargo . ( At $50 a barrel , a 2 million barrel super tanker cargo costs circa $100 million) The value to the investor is equivalent to $0.33 per barrel at 2 million barrels monthly for 12 months or $8 million , for one total year, and one year only, which is the period the purchased MT799 is valid and may be utilized.

23. After signing the Trade Investment agreement, Investor A wired GRL $50,000 the same day.

24. In November 2017, Investor A wrote to Henderson by e-mail and asked for "a quick update as to whether [he had] used [her] investment as agreed upon and if not [was Henderson] still planning on it in the year specified." In response, Henderson wrote that he had "used some of the monies trying to secure the financial instrument" as agreed in the Trade Investment agreement.

25. Henderson's statement in this regard was false. As discussed further below, he used none of Investor A's investment to "secure [a] financial instrument." Instead, Henderson spent the majority of Investor A's investment to pay for personal expenses, including visits to numerous Chicago-area bars and restaurants, dental work, department store shopping, and two trips to the Caribbean.

26. Again, none of the "oil deals" described by Henderson have occurred, and Investor A has not received any return on her investment whatsoever.

**The June 2017 Securities Solicitation**

27. On June 30, 2017, Henderson sent an e-mail soliciting investments ("June 2017 E-mail"). The over 150 recipients were comprised of individuals associated with a Christian liberal arts college ("College 1"), and religious organizations with which Henderson was associated, including the church that he founded.

28. The June 2017 E-mail made multiple religious references. For example, Henderson referenced the investment opportunity as "a Kingdom vision that is For Christ and His Kingdom" that will purportedly "stir up the apostles, prophets, leaders, evangelists to lead the way in the church and in the world." Henderson also referred to his partner, Individual 1, as a "Nigerian believer" who is also an "apostle/tentmaker in Africa" and also stated that "we both have been led by the Spirit to do this."

29. The June 2017 E-mail also claimed that Henderson was starting a hedge fund for College 1 alumni and their networks called the "Sons and Daughters of Thunder" ("SDT") fund. To date, Henderson, on information and belief, has taken no steps to establish such a hedge fund.

30. The June 2017 E-mail, which included several attachments, described various investment opportunities available for the recipients of the e-mail. For instance, one of the attachments described an "Investment Fund" focused on funding trade deals involving crude oil. The attachment further stated that "we need to have a significant cashflow and shared risk with other investors." There were three additional attachments, each referred to as a "Trade Investment Agreement with Global Resources Leadership." The attachments were titled, separately, "Class A", "Class B" and "Class C," and each attachment offered investments with significantly large returns in relatively short periods of time. For example, Henderson promised that a $175,000 Class A investment would yield a $1.3 million return in 90 days.

31. While soliciting investments via the June 2017 E-mail, Defendants knowingly and/or recklessly made (and were also negligent in making) several materially false or misleading statements or omissions, including that (1) the Tribe had established its own commercial bank and had promised the joint venture a $250 million letter of credit; (2) the Tribe was providing the joint venture with $200 billion in gold bullion that was being "monetized in the international market"; (3) the joint venture's assets would be "monetized and matched" by the governments of Ghana, Rwanda, Uganda and Ethiopia and that these governments were willing to provide sovereign assets so they would have "skin in the game"; and (4) the "Nigerian government is obligated to give us Sovereign Funds" to match the assets provided by the Tribe.

32. Each of these claims was materially false or misleading, as described herein.

8

33. Henderson falsely stated in the June 2017 E-mail that the Tribe had established its own commercial bank and had promised the joint venture a $250 million letter of credit and access to $200 billion in gold bullion that was being "monetized in the international market."

34. Henderson knew, or was at least reckless in not knowing, that the Tribe did not have a bank and had never established a bank of any type. Henderson further knew, or was at least reckless in not knowing, that the Tribe had never promised the joint venture a $250 million letter of credit. Prior to sending the June 2017 E-mail, Henderson did nothing to confirm or attempt to confirm that the Tribe had established a bank or that it had access to such funds.

35. Likewise, Henderson knew, or was at least reckless in not knowing, that the Tribe had never promised $200 billion in gold bullion to the joint venture, and he had no reasonable basis to believe the Tribe even had (or had access to) $200 billion in gold bullion.

36. Henderson also falsely asserted that the joint venture's assets would be "monetized and matched" by the governments of Ghana, Rwanda, Uganda, and Ethiopia and that the Nigerian government was obligated to provide the joint venture with sovereign funds.

37. Henderson knew, or was reckless in not knowing, that the governments of Ghana, Rwanda, Uganda, and Ethiopia did not agree, and had not agreed, to "monetize" or "match" the assets of the joint venture. There were no written nor oral agreements between any of these governments and the joint venture (or either Defendant).

38. Henderson also falsely stated in the June 2017 E-mail that the Nigerian government was obligated to provide the joint venture with sovereign assets to match the assets provided by the Tribe. There was no such obligation by the Nigerian government at the time Henderson made that statement or at any other time.

39. On July 5, 2017, Investor B signed a "Class C: Trade Investment Agreement" with GRL. The agreement, which Henderson drafted, described the offering as follows:

> Investment offer:
> For a $10,000 investment from a qualified investor, received via Wire Transfer into Global Resources Leadership, LLC's designated Wells Fargo business account, a financial instrument will be secured to enable a TTO (Tanker Take Over) crude oil transaction to take place in a safe port (Tema, Ghana). The instrument will be used to secure a transaction with a 1 million barrel vessel for which the investor will receive $0.25 per barrel for a total of $250K in 30 days from the completion of the transaction. (The principal of $10,000 will be returned and the ROI will be $240,000).

40. Also on July 5, 2017, Investor B transferred $7,500 to GRL, and on July 6, 2017, Investor B transferred an additional $2,500.

41. On August 3, 2017, Investor B and Henderson contracted to "parlay" the supposed returns on Investor B's investment into a "Class A" investment. In reality, however, there were no returns. None of the "oil deals" promoted by Henderson have occurred, and Investor B has not received any return on his investment whatsoever.

42. On August 23, 2017, the Georgia Department of Banking and Finance issued an Order to Cease and Desist to the operators of the "tribal bank" mentioned in Defendants' June 2017 E-mail. On September 27, 2017, another Cease and Desist order was issued, this time to Henderson for his role in the operation of the unlawful bank. And, on October 16, 2018, the Superior Court of Banks County, Georgia entered a Default Judgment against Henderson and others in connection with the Cease and Desist Orders.

43. As of December 9, 2020, Henderson had not advised Investor B of the issuance of the Cease and Desist Order or Default Judgment.

**Defendants' Misuse of Investor Proceeds**

44. The June 2017 E-mail attachments also stated that the invested funds were to be used to secure financial instruments to facilitate the purchase of crude oil. And, Defendants' written agreement with Investor A specifically stated that the funds would be used to finance and

10

secure a petroleum transaction with the Nigerian National Petroleum Company, with whom Defendants claimed to have an agreement.

45. However, Henderson knowingly and/or recklessly (and also negligently) took a portion of, Investor A's and Investor B's funds, which were deposited in GRL's bank account, and used such investments to pay for personal expenses.

46. Henderson used his investors' funds to pay for dozens of trips to Chicago-area restaurants and bars, numerous cash withdrawals, purchases at Wal-Mart and Neiman Marcus, dental work, shoes, and trips to the Turks and Caicos and Aruba.

47. Specifically, bank records show that Henderson spent Investor B's $50,000 investment as follows:

| Category Of Expenditure | Total |
|---|---|
| Chicago-area Bars and Restaurants | $4,620 |
| Wal-Mart, Costco, GNC, DSW, Walgreens, and Neiman Marcus | $6,718 |
| Caribbean/Vacation Travel | $12,758 |
| Dental | $931 |
| ATMs/Cash Withdrawals | $3,060 |
| **TOTAL** | **$28,087** |

**The Unregistered Securities**

48. Each of Henderson's and GRL's solicitations between December 2016 and June 2017 constituted an offer of securities, in the form of investment contracts. Each expressly

solicited the investment of money, and the solicited individuals, including Investors A and B, were asked to invest at various levels, ranging from $10,000 to $175,000.

49. Each of the solicitations contemplated shared risk with other investors through the pooling of invested funds, to be used to purchase the financial instruments and spread the risk of the crude oil transactions across that pool.

50. Each solicitation also promised specific returns on investments, or profits, based on the respective investment levels (e.g., Class A, B, C) described in, *inter alia*, the June 2017 E-mail and its attachments.

51. And each solicitation described the steps that Defendants and their partners would take to raise funds, obtain the financial instruments, and negotiate and execute the crude oil transactions with NPPC and foreign refineries. None of the solicitations identified or described any steps or actions to be taken by investors.

52. Henderson sold or offered to sell GRL's investment contracts even though they had not filed a registration statement with the Commission and the investment contracts were not exempt from the registration requirements of the Securities Act.

53. Henderson utilized means of interstate commerce by, *inter alia*, sending the June 2017 E-mail to over 150 individuals, including some individuals residing outside the state of Illinois. Henderson offered and sold an investment contract to Investor A, who resides in Missouri, and Investor B, who resides in California.

## FIRST CLAIM

### Each Defendant Violated Exchange Act Section 10(b) and Rule 10b-5

54. The Commission realleges and incorporates by reference paragraphs 1 through 53.

55. Each Defendant, directly and indirectly, with scienter, and in connection with the purchase or sale of securities and by use of the means or instruments of interstate commerce or the mails: (a) has employed devices, schemes or artifices to defraud; (b) has made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) has engaged in acts, practices, or courses of business which operated, would operate, and/or are operating as a fraud or deceit upon the purchasers, sellers, and/or prospective purchasers or sellers of securities.

56. By reason of the foregoing, each Defendant violated and, unless restrained and enjoined, will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM

### Each Defendant Violated Securities Act Section 17(a)

57. The Commission realleges and incorporates by reference paragraphs 1 through 53.

58. Each Defendant, directly or indirectly, in the offer or sale of securities and by use of the means or instruments of interstate commerce or the mails: (a) has employed, is employing, or is about to employ devices, schemes, or artifices to defraud; (b) has obtained, is obtaining, or is about to obtain money or property by means of untrue statements of material fact and the omissions of material facts necessary to make the statements made, in light of the

13

circumstances under which they were made, not misleading; and (c) has engaged, is engaged, or is about to engage in transactions, acts, practices, and courses of business which operated, would operate, and/or are operating as a fraud upon the purchasers, sellers, and/or prospective purchasers or sellers of securities.

59. Defendants engaged in the aforementioned conduct with scienter, and they also failed to exercise reasonable care with regard to their conduct and consequently were negligent.

60. By reason of the foregoing, each Defendant has violated and, unless restrained and enjoined, will continue to violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### THIRD CLAIM

### Each Defendant Violated Securities Act Sections 5(a) and 5(c)

61. The Commission realleges and incorporates by reference paragraphs 1 through 53.

62. The December 2016 in-person solicitation and Defendants' June 2017 E-mail, plus the attachments, and Defendants' other statements and inducements constituted offers of securities, and at least two investors purchased securities based on Defendants' offers.

63. Each Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities in the form of investment contracts and carried or caused to be carried through the mails, or in interstate commerce, by means or instruments of transportation, such securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities and for which no exemption validly applied.

64. By reason of the foregoing, each Defendant has violated and, unless restrained and enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

### I.

Finding that Defendants committed the violations alleged above;

### II.

Permanently enjoining Defendants from further violations of Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 17(a), 5(a), and 5(c) of the Securities Act [15 U.S.C. §§ 77q(a), 77e(a), and 77e(c)];

### III.

Permanently enjoining Defendants from directly or indirectly, including but not limited to through any entity owned or controlled by either of them, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant Henderson from purchasing or selling securities for his own personal account;

### IV.

Ordering Defendants to disgorge and pay all ill-gotten gains received or unjust enrichment derived from the illegal conduct alleged in this Complaint, plus pre-judgment interest thereon;

### V.

Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VI.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

The Commission demands a trial by jury on all issues so triable.

Dated: December 23, 2020         Respectfully submitted,

*/s Nicholas C. Margida*
Stephan J. Schlegelmilch
Nicholas C. Margida (*pro hac vice*)
Christina M. Adams (*pro hac vice*)
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549-5977
(202) 551-4935 (Schlegelmilch)
(202) 551-8504 (Margida)
(202) 551-5695 (Adams)
SchlegelmilchS@SEC.gov
MargidaN@SEC.gov
AdamsCM@SEC.gov
*Attorneys for Plaintiff U.S. Securities and Exchange Commission*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2020, I caused a copy of the Amended Complaint, to be served by ECF, and by UPS and e-mail on Defendant John Henderson at the following physical and e-mail addresses:

> John Henderson
> 224 East Bailey Rd., Ste. E
> Naperville, IL 60565
> john@GlobalResourcesLeadership.com
> johnhendersoncentral@gmail.com

> */s/ Nicholas C. Margida*
> *Counsel for Plaintiff*
> *U.S. Securities and Exchange Commission*