**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-06183 |
| JOHN HENDERSON, et al., | Hon. Charles R. Norgle |
| Defendants. | |

## ORDER

Plaintiff U.S. Securities and Exchange Commission's motion for summary judgment on all claims against Defendant John Henderson [68] is granted. Defendant John Henderson's motions for summary judgment [73], and for sanctions or involuntary dismissal with prejudice [81] [83] are denied. The parties shall file written status reports by April 5, 2022, that identify the remaining issues in this case and propose a scheduling order for further dispositive motions or a trial date to resolve those issues.

## MEMORANDUM OPINION

Plaintiff U.S. Securities and Exchange Commission filed this civil enforcement action against Defendants John Henderson and his company Global Resources Leadership, LLC, asserting claims against Defendants for violations of § 10(b) of the Exchange Act and the SEC's Rule 10b-5, as well as §§ 5(a), 5(c), and 17(a) of the Securities Act. The SEC alleges that Defendants conducted two unregistered and fraudulent securities offerings regarding a purported joint venture to buy and sell Nigerian crude oil that raised $60,000 in investments from two investors. According to the SEC, Henderson's solicitations included numerous lies, including about how the investments would be used and, instead of using the investments as he represented, Henderson speat nearly all the investments on himself. The remedies that the SEC seeks for those

violations include permanent injunctions against Defendants, disgorgement of all ill-gotten gains or unjust enrichment derived from the violations, and civil monetary penalties under § 20(d) of the Securities Act and § 21(d)(3) of the Exchange Act.

Now before the Court is the SEC's motion for summary judgment on all claims against Henderson, Dkt. 68, as well as Henderson's motions for summary judgment, Dkt. 73, and for sanctions or involuntary dismissal with prejudice, Dkt. 81, 83. As explained below, the Court grants the SEC's motion and denies Henderson's motions.

However, those rulings do not end this case. The Court has previously entered an order of default against Global Resources Leadership, LLC for its failure to appear, plead, or otherwise defend itself in this action, Dkt. 41, but the SEC has not moved for a judgment, default or otherwise, against it. Similarly, the SEC's motion for summary judgment against Henderson seeks only a ruling that Henderson committed the violations of the Exchange Act and the Securities Act alleged in the SEC's amended complaint. In other words, the SEC's motion for summary judgment seeks only a judgment as to Henderson's liability for the alleged violations and does not address the remedies (permanent injunctions, disgorgement, and civil penalties) that the SEC claims it is entitled to for those violations. Accordingly, the parties shall file written status reports by April 5, 2022, that identify the remaining issues in this case and propose a scheduling order for further dispositive motions or a trial date to resolve those remaining issues.

## I. BACKGROUND

In compliance with Local Rule 56.1, the SEC filed in conjunction with its motion for summary judgment a statement of material facts and supporting evidence including 35 documentary exhibits. Dkt. 70. The SEC also filed a notice it provided to Henderson under Local Rule 56.2 for unrepresented litigants opposing summary judgment. Dkt. 71. The notice instructed

Henderson, in pertinent part, that he must respond to the SEC's statement of facts or else the Court may accept them as true. Id. at 2-3.

Henderson did not file a response to the SEC's statement of facts. Rather, Henderson's response to the SEC's summary judgment motion invokes his Fifth Amendment right against self-incrimination and a demand that the Court defer its consideration of this case until he is granted immunity, or the threat of criminal prosecution is dissipated. Dkt. 79 at 2.[1] But as the SEC explains in its reply brief and as the Court previously explained in denying Henderson's motion to stay the case pending resolution of a criminal investigation by the FBI and the Department of Justice, "'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" Harris v. City of Chicago, 266 F.3d 750, 753 (7th Cir. 2001) (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)). In other words, "the very fact of a parallel criminal proceeding . . . does not alone undercut a defendant or claimant's privilege against self-incrimination, even though the pendency of the criminal action forces him to choose between preserving his privilege against self-incrimination and losing the civil suit." U.S. v. 6250 Ledge Rd., Egg Harbor, Wisc., 943 F.2d 721, 729 (7th Cir. 1991) (cleaned up).

Accordingly, because Henderson has not challenged the SEC's statement of facts, the Court accepts those facts as true for purposes of the SEC's summary judgment motion. L.R. 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."); Raymond v. Ameritech Corp., 442 F.3d 600, 604 ("district courts are

---

[1] Henderson also complains that this case violates his First Amendment free exercise rights because of his "ministerial role in the 'business as missions' intent" of his business. Dkt. 79 at 2. But the Court agrees with the SEC that Henderson has waived that argument by not developing it or supporting it with any authority. See Williams v. Bd. of Educ. of Chicago, 982 F.3d 495, 511 (7th Cir. 2020).

entitled to expect strict compliance with Local Rule 56.1"). The following facts that the Court deems admitted by Henderson are derived from the SEC's statement of facts.

Henderson is a resident of Naperville, Illinois and an alumnus of Wheaton College, an evangelical Christian university. Dkt. 70 at ¶¶ 1-2. Henderson often describes himself has a pastor, church founder, and missionary. Id. at ¶ 2. Henderson is also the founder, owner, President, and managing member of Global Resources Leadership, LLC, a Delaware limited liability company with no employees that acts exclusively through Henderson. Id. at ¶ 3. Between at least October 2016 and October 2017, Henderson's company had a bank account at Wells Fargo, with an account number ending in 4646, on which Henderson was the only signatory and the only person with authority to spend money in the account. Id. at ¶ 7. When Henderson provided sworn testimony to the SEC on November 15, 2018, his company was insolvent with only $22 in cash on hand and $500 in debt. Id. at ¶ 4.

Starting before 2015 and lasting until at least November 2020, Henderson's company purported to be in the business of facilitating the purchase and sale of crude oil, primarily from the Bonny Island region of Nigeria. Id. at ¶ 5. More recently, Henderson's company has claimed to be involved in myriad other endeavors, "including 'block chain technology,' telecommunications, health care, 'carbonite nanotubes,' and others." Ibid.

In 2015, Henderson met a Nigerian citizen who claimed to be a bishop affiliated with churches in Nigeria and the U.S., and to be engaged in the international petroleum business, particularly in Nigeria. Id. at ¶ 9.[2] Henderson, through his company, and the Nigerian individual, through his company, entered into a joint venture agreement in late 2015, the stated purpose of

---

[2] The SEC's statement of facts contains two successive paragraphs listed as paragraph 9. This citation refers to the second of those paragraphs, the first paragraph under the heading "The Crude Oil Joint Venture." Dkt. 70 at p. 4.

which was to broker crude oil transactions between Nigerian sellers and overseas purchasers. Id. at ¶ 10. Henderson represented in the agreement that he was "active in commodities, including minerals, agriculturals, agro-business, and pharmaceuticals." Id. at ¶ 10. Under the agreement, Henderson and his company were responsible to "secure . . . and negotiate the funding of new and ongoing deals." Ibid. At the time, Henderson understood that crude oil sellers required buyers to post a financial instrument or guarantee for the oil to be released to insure and protect the seller against loss if, for example, the oil was not delivered to the buyer because the shipping vessel was lost at sea. Id. at ¶ 12. Acceptable financial instruments are typically issued by banks in the form of a letter of credit. Ibid. The joint venture placed the responsibility to find investors who could fund such financial instruments on Henderson and his company. Ibid. When discussing the issue with potential investors, Henderson often referred to the guarantee requirement as a "MT799," a "MT760," or a "standby letter of credit." Id. at ¶ 13.

Within days of entering into the joint venture agreement, Henderson began searching for investors in the U.S. Id. at ¶ 14. Specifically, on December 26, 2015, Henderson informed more than 40 prospective investors by email that he had already had success as a petroleum "connector," "broker," and "[b]uyer," and that an investment of $150,000 would be used to secure a financial instrument necessary to complete an oil deal and would generate for investors a profit of $45 million within 12 months. Ibid.

About a year later, Henderson met with Diane Little, a Missouri resident and the mother of Henderson's volunteer "assistant," to discuss a possible investment in Henderson's company. Id. at ¶ 16. During the in-person meeting in Chicago, Henderson encouraged Little to invest $150,000, representing that he and his company would use the funds with other contributors' investments to obtain a "MT799" financial instrument and to broker a transaction for Nigerian oil from which all

5

investors and Henderson would profit. Id. at ¶ 17. In a December 25, 2016 follow-up email, Henderson reiterated to Little that any investment would be used to obtain "financial instruments" to facilitate the oil deal. Id. at ¶ 18. Henderson also told Little that she could invest as little as but no less than $50,000, but that the investment offer was only "open for a short period of time and for a limited number of people." Ibid. Three days later, Henderson described his offer as being "in the vein" of "municipal bonds" and like "an IPO for Global Trade Investment." Id. at ¶ 19. In another follow-up email on January 6, 2017, Henderson repeated that he intended to use Little's $50,000 investment to obtain a financial instrument and that an unspecified hedge fund was now also involved in his company's oil deal. Id. at ¶ 20. Henderson stated, "the moneys will be sent to the dedicated account in JP Morgan Chase to establish the MT799 as agreed in the contract I have with them. Furthermore, I will go to NY and meet with the Hedge Fund principal and two bank officers in charge of the transaction BEFORE we transact." Ibid.

Henderson, through his company, entered into a written agreement with Little that set the terms of her $50,000 investment. Id. at ¶ 21. The agreement represented that in exchange for her $50,000 investment with Henderson's company, she "will receive up to $8 million in one year, paid out at an average anticipated rate of $666,666.66 per month. First payment will be 30 days from the event where the MT799 is secured in the name of Global Resources Leadership in the JP Morgan Chase bank or other Prime Bank." Ibid. The agreement also provided that if Little's $50,000 investment was not used as represented within 90 days of receipt, it would be "returned within 30 days . . . less fees not to exceed 5%." Id. at ¶ 22.

The agreement further described the steps that Henderson, his company, and their joint venture partner would take to raise funds, obtain financial instruments, and negotiate and execute the crude oil transactions with the Nigerian National Petroleum Corporation and foreign refineries,

but did not identify or describe any further necessary actions by Little. Id. at ¶ 23. At Henderson's instruction, Little wired $50,000 to the Wells Fargo bank account of Henderson's company. Id. at ¶ 24. Henderson spent the $50,000 investment within six months and most of it by May 17, 2017, but not to finance crude oil transactions. Id. at ¶ 25. Instead, while Henderson transferred $10,101 to his joint venture partner, Henderson spent the rest of the money for personal expenses, including at Chicago-area bars and restaurants, on dental services, at Costco and Neiman Marcus, and on travel to the Turks and Caicos, Aruba, and Florida. Id. at ¶¶ 25-26.

Little followed-up with Henderson on November 13, 2017: "I know you are very busy but I would appreciate a quick update as to whether you have used my investment as agreed upon and if not are you still planning on it in the year specified? If you are that is fine. If not please return the money or give me an opportunity to keep it invested with you on new terms." Id. at ¶ 27. Henderson responded: "I have used some of the monies trying to secure the financial instrument needed and the confirmation of supply sources needed to bring initial, then steady, then increasing volume of supply in order to fulfil our Exit buyer contracts." Id. at ¶ 28. In reality, Henderson had already spent all of Little's $50,000 investment and none of it was spent on a financial instrument to facilitate a crude oil transaction. Id. at ¶ 29.

Henderson and Little agreed by email on June 26, 2018 to "parlay" Little's investment: Henderson and his company promised $8 million in profits in exchange for Little's agreement not to withdraw her investment. Id. at ¶ 30. Until this litigation, Henderson never told Little how or when he spent her investment. Id. at ¶ 31. Though Little has not received any return on her investment, and notwithstanding the insolvency of Henderson's company, Henderson has represented to Little that she should still expect a return. Ibid. Neither Henderson nor his company

filed a registration statement with the SEC relating to Henderson's December 2016 solicitation of Little. Id. at ¶ 33.

Since Henderson had quickly spent Little's $50,000 investment, the balance of his company's bank account as of June 30, 2017 was only $101. Id. at ¶ 34. On that day, Henderson sent an email soliciting more investments to more than 150 individuals associated with Wheaton College, Henderson's alma mater, and religious organizations with which Henderson was associated, including a church that Henderson founded. Id. at ¶¶ 35-36. Henderson claimed that he was staring a hedge fund for Wheaton College alumni and their networks, which Henderson called the "Sons and Daughters of Thunder" fund. Id. at ¶ 37. Henderson does not operate and has taken no steps to establish such a hedge fund. Ibid.

Henderson's June 2017 email described various investment opportunities and included four attached documents. Id. at ¶ 39. One attachment titled "SDT Investment Fund" described "a nascent Investment Fund focusing on Trade Deals" involving crude oil. Ibid. It further stated, "we need to have a significant cashflow and shared risk with other investors" and that "[t]his opportunity mirrors" the introduction of "the first Municipal Bonds to be invested in by the general public" and that the "SDT Investment Fund does a similar thing in globally trade commodities." Ibid. The three other attachments were form "Trade Investment Agreements with Global Resources Leadership" at three different investment levels—"Class A," "Class B," and "Class C"—that promised large and fast returns. Id. at ¶ 40. Specifically, Henderson promised in 90 days, a $175,000 Class A investment would yield a $1.325 million return, a $60,000 Class B investment would yield a $440,000 return, and a $10,000 Class C investment would yield a $240,000 return. Ibid.

8

Like Little's investment agreement, the Class A, B, and C investment agreements did not require investors to contribute anything other than money to obtain the promised returns: investors had no role in raising additional funds, procuring financial instruments, or negotiating or executing any crude oil transactions with any foreign governments or refineries. Id. at ¶ 41. Henderson's June 2017 email also stated, like Henderson's solicitation of Little, that the invested funds would be used to secure financial instruments to facilitate the purchase of crude oil. Id. at ¶ 42.

Henderson's June 2017 email made multiple religious references, describing the investment opportunity as "a Kingdom vision that is For Christ and His Kingdom" that will "stir up the apostles, prophets, leaders, evangelists to lead the way in the church and in the world." Id. at ¶ 43. Likewise, Henderson referred to his joint venture partner as a "Nigerian believer" who had been "led by the Spirit to do this." Ibid.

Henderson's email made other, more far-fetched, claims too. For example, Henderson represented that a Native American tribe was "providing [his] Joint Venture $200 billion in gold bullion / hallmarked assets that [were] just now being monetized in the international market and already approved by Bank of America and Bank of China." Id. at ¶ 44. Henderson continued that the tribe "just established their own commercial bank, and now have promised us a StandBy Letter of Credit/SBLC for $250 million . . . ." Id. at ¶ 45. Henderson contends that his representations regarding the tribe were made in reliance on information provided by his joint venture partner. Id. at ¶ 50. In any event, Henderson did not independently verify the representations or conduct any due diligence on the issue before making the representations in the June 2017 email and no one reviewed the email before he sent it. Id. at ¶¶ 50-51. Further, between August and October 2017, Henderson learned that the tribe had not provided and would not be able to provide "$200 billion in gold bullion / hallmarked assets;" did not operate a "commercial bank" but merely owned a

9

"defunct bank" that it hoped to turn into a "central bank;" and had not provided or promised a $250 million standby letter of credit. Id. at ¶¶ 52-53.

Henderson also claimed in the June 2017 email that the joint venture's assets would be "monetized and matched" by the governments of Ghana, Rwanda, Uganda, and Ethiopia, and that those governments were willing to provide sovereign assets so they would have "skin in the game." Id. at ¶ 46. Similarly, Henderson claimed in the "SDT Investment Fund" document that "[t]he Nigerian government is obligated to give us Sovereign Funds . . . ." Id. at ¶ 47.

At the time Henderson sent the June 2017 email, he knew that no representatives of any of the governments of Ghana, Rwanda, Uganda, or Ethiopia had represented that their respective governments would provide "sovereign assets," matching or otherwise, to the joint venture. Id. at ¶ 48. Rather, Henderson admitted to the SEC that his statement was "aspirational" and based on what he "hoped" those governments would do, though that was not explained in his June 2017 email. Ibid. Much the same is true of Henderson's claim that the Nigerian government was obligated to provide sovereign funds—Henderson was not aware of any such agreement because there was none, though Henderson described such obligations as "a given in international business" in response to the SEC's requests for admission in this case. Id. at ¶ 49.

A recipient of Henderson's June 2017 email, Peter Alvino, replied on June 30, 2017, asking Henderson several questions about the solicitation including whether the "request was [for] a donation of sorts" or whether it was for "an investment which will grow and eventually result in a profit for us." Id. at ¶ 54. Henderson responded the next day, stating, "[t]his request is [for] an investment with a return promised." Id. at ¶ 55. Henderson continued, "[a]s you can see from the contracts [attached to the June 2017 solicitation email] it is a huge opportunity to make a profit wisely [a]nd, together, to invest it wisely as we each individually and corporately decide." Ibid. In

response, Alvino acknowledged that all investments carry risk and asked Henderson whether he too was investing, "and if so at what level?" Id. at ¶ 56. Henderson represented to Alvino that he had "invested nearly a million to create this opportunity," though Henderson testified during the SEC's investigation that he had invested only $100,000 as of November 2018. Ibid.

Alvino ultimately signed a "Class C: Trade Investment Agreement" with Henderson's company. Id. at ¶ 57. The agreement provided that Alvino would invest $10,000 to be transferred by wire transfer to the Wells Fargo bank account of Henderson's company, which would be used to secure a financial instrument to enable a crude oil transaction "with a 1 million barrel vessel" for which Alvino would "receive $0.25 per barrel for a total of $250K in 30 days from the completion of the transaction." Ibid. The agreement noted that $10,000 of the promised $250,000 would be a return of Alvino's initial investment, thus promising a profit of $240,000. Ibid. Henderson did not ask Alvino if he was an accredited investor or do anything to determine whether he was. Id. at ¶ 58. And neither Henderson nor his company ever filed a Form D with the SEC regarding the June 2017 email solicitation. Id. at ¶ 59. Nor did Henderson or his company file a registration statement for the June 2017 email solicitation. Id. at ¶ 60.

Alvino made transfers totaling $10,000 to the Wells Fargo bank account of Henderson's company on July 5 and 6, 2017. Id. at ¶ 61. Though Alvino's agreement with Henderson's company represented that the $10,000 investment would be used to secure a financial instrument to enable a crude oil transaction, throughout July 2017, Henderson instead again used the money to pay for personal expenses, including at bars and restaurants, and for cash withdrawals, travel expenses, and shopping and other personal services. Id. at ¶¶ 62-64. The balance of the Wells Fargo bank account of Henderson's company was just a few hundred dollars by the end of July

2017. Id. at ¶ 66. Henderson did not use any of Alvino's investment to obtain a financial instrument and did not tell Alvino how he used the money. Id. at ¶ 65.

By early August 2017, Henderson determined that the tribe referenced in his June 2017 email solicitation was, at a minimum, "fishy" and "most likely a scam" in part based on Henderson's receipt on August 2, 2017 of a report that the tribe may be operating a "financial Ghost fraud scheme." Id. at ¶ 68. Henderson did not disclose those findings to Alvino. Id. at ¶ 69. But on August 3, 2017, Alvino contracted with Henderson and his company to "parlay" the supposed "returns" on his investment into a "Class A" investment. Id. at ¶ 67. Specifically, the contract provided that "[t]he returns from the Class C investment due to Investor, upon completion of the investment document as written, will go to fund the Class A investment" and that "[a]ll remaining funds of the return on the Class C investment will be transferred to the Investor's account . . . ." Ibid. No funds were transferred to Alvino's account. Ibid.

Near the end of August 2017, the Georgia Department of Banking and Finance issued a cease-and-desist order to the tribe and the operators of the tribe's bank because the bank had been operating illegally. Id. at ¶ 70. The Department issued another cease-and-desist order about a month later, which included Henderson for his role in operating the illegal bank, which ultimately led to a default judgment being entered against Henderson in the Superior Court of Banks County, Georgia on October 16, 2018. Ibid. Henderson had not advised Alvino of the cease-and-desist order issued against him as of December 9, 2020 and had not advised Little of the order as of February 18, 2021. Ibid.

Henderson told Alvino that the tribe had "misreprent[ed] their assets once [Henderson and his company] thoroughly reviewed them" for the first time on April 12, 2019, soon after the SEC contacted Alvino during its investigation of Henderson. Id. at ¶ 69. After Henderson learned of the

12

SEC's investigation of him and his company, Henderson wired a total of $10,000 to Alvino on August 5 and 8, 2019. Id. at ¶ 72. As of November 2020, none of the "crude oil transactions" contemplated in the June 2017 email solicitation and promoted by Henderson have occurred. Id. at ¶ 71. In fact, neither Henderson nor his company has ever completed a single crude oil transaction and Henderson's company has never earned any revenue. Id. at ¶ 15.

## II. LEGAL STANDARD

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Rather, the Court must view "the record in the light most favorable to the nonmovant and [avoid] the temptation to decide which party's version of the facts is more likely true." Id.

"To defeat a motion for summary judgment, the party opposing it must make a 'showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.'" Johnson v. Advocate Health & Hospitals Corp., 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "Summary judgment is a critical moment for a non-moving party. It must 'respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there

is a genuine dispute of material fact for trial.'" Id. at 894 (quoting Grant v. Trs. of Ind. Univ., 870 F.3d 562, 568 (7th Cir. 2017)). "Inferences supported only by speculation or conjecture will not suffice." Ibid. "Neither will the mere scintilla of evidence." Ibid.

## III. ANALYSIS

Three motions are now before the Court: the SEC's motion for summary judgment, Henderson's motion for summary judgment, and Henderson's motion for sanctions or involuntary dismissal with prejudice. As noted at the outset, the SEC's motion for summary judgment seeks a ruling that Henderson committed the violations of the Securities Act and the Exchange Act as alleged in the SEC's amended complaint. Though Henderson's response to the SEC's motion is only a single page invoking his Fifth Amendment right against self-incrimination (as well as throwaway arguments that "violations in discovery by the SEC" violated his Fifth Amendment due process rights and that this case violates his First Amendment free exercise rights), Henderson's motion for summary judgment makes substantive arguments as to the SEC's claims against him. Specifically, Henderson argues that the SEC has failed to prove damages because Little and Alvino claim none, that the SEC has failed to prove scienter, and that the SEC has failed to prove that Henderson made any unregistered securities offerings or that Little or Alvino purchased securities or invested in his company.

For the reasons explained below, the Court grants the SEC's motion for summary judgment and denies Henderson's motion for summary judgment. The undisputed facts, above, reveal that there are no genuine issues of material fact that Henderson committed the violations alleged in the SEC's amended complaint. Henderson's arguments to the contrary fail as a matter of fact and law. The Court also denies Henderson's motion for sanctions or involuntary dismissal with prejudice.

**A. The Court grants the SEC's motion for summary judgment and denies Henderson's motion for summary judgment because there is no genuine issue of material fact that Henderson violated §§ 5 and 17(a) of the Securities Act and SEC Rule 10b-5 implementing § 10(b) of the Exchange Act.**

The SEC's amended complaint contains three claims against Henderson and his company: (1) violation of SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, implementing § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); (2) violation of § 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and (3) violation of §§ 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c). Dkt. 32. The SEC's motion for summary judgment addresses those three claims in two sections, first addressing its claim for violation of § 5 of the Securities Act on its own and second addressing its remaining claims grouped together as fraud claims.

The SEC's organization of its memorandum is justified from a conceptual standpoint as both SEC Rule 10b-5 implementing § 10(b) of the Exchange Act and § 17(a) of the Securities Act are anti-fraud securities regulations. See Lorenzo v. SEC, 139 S.Ct. 1094, 1100 (2019). And the elements for each are "essentially the same," except that § 17(a) applies to a broader range of conduct, including to offers or sales of securities (compared to § 10(b), which applies only to purchases or sales), and to negligent conduct (as opposed to § 10(b)'s scienter requirement). See SEC v. Kameli, 276 F. Supp. 3d 852, 861-62 (N.D. Ill. 2017). §§ 5(a) and (c) of the Securities Act, on the other hand, are not anti-fraud regulations, but merely impose registration requirements and prohibit unregistered sales or delivery after sales of, or offers to buy or sell, securities. 15 U.S.C. § 77e(a), (c). So the Court will follow the SEC's organization and first review its claim under §§ 5(a) and (c) of the Securities Act, followed by its fraud claims under § 10(b) of the Exchange Act as implemented by SEC Rule 10b-5 and § 17(a) of the Securities Act.

**1. The undisputed facts and evidence show that Henderson violated §§ 5(a) and (c) of the Securities Act because he offered to sell and sold securities using interstate facilities and did not file a registration statement for those offers and sales.**

To prove a violation of § 5, the SEC must show: "(1) the defendant directly or indirectly sold or offered to sell securities, (2) no registration statement was in effect or filed as to the securities involved, and (3) the offer or sale was made through the use of interstate facilities or the mails." SEC v. Zenergy Int'l, Inc., 141 F. Supp. 3d 846, 852 (N.D. Ill. 2015). There is no intent requirement for violations of § 5, so "good faith is not relevant to whether there has been a primary violation of the registration requirements." SEC v. Holschuh, 694 F.2d 130, 139 n. 13 (7th Cir. 1982).

The SEC claims that Henderson's answer to the SEC's amended complaint admits that his December 2016 solicitation of Little and his June 2017 email were offers of securities "in the form of investment contracts." But Henderson's answer more specifically denies that those communications were solicitations. Dkt. 34 at ¶ 48. Nevertheless, Henderson has failed to support that denial with any evidence or reasoned argument. True, in Henderson's motion for summary judgment, Henderson argues that the SEC has failed to prove that any payment to him or his company was an investment because it could "simply be that they wanted to support Defendant, as a minister, and to encourage their friendship and fellowship with Mr. Henderson who has been a lifelong minister, and that they had little expectation beyond the possibility of ministry, making their investment motive a contribution to encourage the Defendant, rather than any SEC violation." Dkt. 73 at 4. But that argument is not supported by any facts or evidence and is belied by the undisputed facts that Henderson repeatedly represented that investments would be used to finance crude oil transactions and promised astronomical profits. Henderson also argues that "[t]he SEC fails to identify with specificity which of the communications are securities offerings and should

16

have been registered." Dkt. 73 at 4. But, as explained below, the SEC has, in fact, identified the specific communications it claims were offers of securities.

Specifically, in December 2016, Henderson asked Little to invest money in his company at an in person meeting in Chicago and by email. Dkt. 70 at ¶¶ 16-20. And Little ultimately invested $50,000 under a written contract. Id. at ¶ 21. That contract was an investment contract, a species of securities, because it involved an investment of money, in a common enterprise, with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. See SEC v. Howey, 328 U.S. 293, 301 (1946). Henderson's solicitation, and Little's contract with Henderson's company, after all, represented the steps that Henderson, his company, and their joint venture partner would take to raise funds, obtain financial instruments, and negotiate and execute the crude oil transactions. Dkt. 70 at ¶ 23. Little's contract also represented that she "will receive up to $8 million in one year, paid out at an average anticipated rate of $666,666.66 per month" or else have her investment returned if it was not used as represented within 90 days. Id. at ¶¶ 21-22. And aside from her investment, Little's involvement was entirely passive. Id. at ¶ 23. Henderson's solicitation of Little and Little's investment contract with Henderson's company was an offer and sale of securities, and it was accomplished in part using interstate facilities, namely email.

The same goes for Henderson's June 2017 email solicitation. In the email, Henderson solicited the investment of money in his company, represented how investments would be used to finance crude oil transactions, and promised large profits without any input from the investors aside from the investments. Dkt. 70 at ¶¶ 35-40. And Henderson ultimately succeeded in finding an investor, Alvino, who passively invested $10,000 in exchange for a promise of $240,000 in profit. Id. at ¶ 57. Thus, Henderson's June 2017 email solicitation, and his company's investment

contract with Alvino was an offer and sale of an investment contract accomplished using interstate facilities.

All that is left for the SEC to make out a prima facie case under § 5, then, is to prove that the offers and sales were unregistered. Henderson's answer to the SEC's amended complaint denies the SEC's allegation that the offers and sales were unregistered. Dkt. 34 at ¶ 52. But the undisputed facts prove otherwise—neither Henderson nor his company ever filed a registration statement for the December 2016 or the June 2017 solicitations and sales. Dkt. 70 at ¶¶ 33, 60.

As the SEC has made out a prima facie case, Henderson bears the burden of proving that an exemption from the registration requirements applies. SEC v. Randy, 38 F. Supp. 2d 657, 667 (N.D. Ill. 1999). Henderson's answer to the SEC's amended complaint invokes purported exemptions under SEC Rules 4(2), 3(b)(1), and 5(d). Dkt. 34 at ¶ 9. But the SEC notes that no such exemptions exist, and Henderson has proffered no evidence or argument to the contrary. Accordingly, the Court concludes that the undisputed evidence shows that Henderson is liable for violating § 5 of the Securities Act.

**2. The undisputed facts and evidence show that Henderson violated SEC Rule 10b-5 implementing § 10(b) of the Exchange Act and § 17(a) of the Securities Act because he knowingly made material misrepresentations and employed a fraudulent scheme in connection with his offer and sale of securities.**

On the SEC's claim under SEC Rule 10b-5 implementing § 10(b) of the Exchange Act, the SEC must prove that Henderson: "(1) made a material misrepresentation or a material omission as to which [he] had a duty to speak, or used a fraudulent device; (2) with scienter; (2) in connection with the purchase or sale of securities." SEC v. Bauer, 723 F.3d 758, 768-69 (7th Cir. 2013). As noted above, the SEC's burden on its claim under § 17(a) of the Securities Act is essentially the same, except it applies to offers of securities too and requires only negligence instead of scienter. Kameli, 276 F. Supp. 3d at 861-62.

18

As explained above as to the SEC's claim under § 5 of the Securities Act, Henderson's December 2016 and June 2017 solicitations were offers of securities in the form of investment contracts, and Little's and Alvino's investment contracts with Henderson's company were therefore sales of securities. The third element of the SEC's fraud claim is therefore satisfied because Henderson's representations discussed below were made in connection with the offers and sales of those securities. Thus, to prevail on its summary judgment motion, the SEC must establish that Henderson made material misrepresentations or omissions, or the use of a fraudulent device, and that Henderson did so with scienter for the SEC's Rule 10b-5 claim or with negligence for the SEC's claim under § 17(a) of the Securities Act.

On the first element of the SEC's fraud claims, violations can be premised on either material misrepresentations or omissions, or the use of a fraudulent device. As the SEC argues, the undisputed facts and evidence establish that Henderson did both. As to material misrepresentations, the SEC notes that Henderson represented to Little that her investment would be used to obtain a financial instrument to facilitate a crude oil transaction at least four times: (1) over lunch in December 2016; (2) in a December 24, 2016 email; (3) in a January 6, 2017 email; and (4) in the investment contract signed by Henderson on his company's behalf. Dkt. 70 at ¶¶ 17-21. Those representations were false and misleading. Little's investment was never used to secure a crude oil transaction. Id. at ¶ 15. Instead, though Henderson transferred about $10,000 of Little's investment to his joint venture partner, Henderson spent the rest of the money on himself. Id. at ¶¶ 25-26.

And when Little followed up on the status of her investment with Henderson in November 2017, Henderson omitted that he had spent nearly all of the investment for personal expenses and lied that he had used some of the money to secure a financial instrument needed for a crude oil

19

transaction. Id. at ¶¶ 27-29. Those misrepresentations and omissions were material because they go to the very heart of Little's investment: how the funds would be used to generate the substantial profits that Henderson promised. See SEC v. Research Automation Corp., 585 F.2d 31, 35 (2d Cir. 1978) ("What reasonable investor would not wish to know that the money raised by stock sales would not be used for working capital but [would] be diverted to [the defendant's] officers?").

Much the same is true of Henderson's June 2017 email solicitation and Alvino's resulting investment. In the email and its attachments, Henderson repeatedly represented that investments in his company would be used to secure a financial instrument to facilitate crude oil transactions. Dkt. 70 at ¶ 39. Alvino's eventual investment contract made the same representation. Id. at ¶¶ 57, 62. Those representations were false and misleading, as Henderson used Alvino's $10,000 investment not on any financial instrument or crude oil transaction, but again only on himself. Id. at ¶¶ 63-65. And those misrepresentations were material for the same reason that Henderson's misrepresentations in his solicitation of Little were because they implicated how the investments would be used to generate the substantial profits Henderson promised.

Henderson's June 2017 email solicitation made other false and misleading representations beyond how investor funds would be used. Henderson's June 2017 email and its attachments also represented that a Native American tribe was providing his joint venture with $200 billion in assets, that the tribe had established a commercial bank and promised the joint venture a $250 million stand-by letter of credit, that his joint venture's assets would be "monetized and matched" by four African countries, and that the Nigerian government was obligated to give the joint venture sovereign funds. Id. at ¶¶ 44-47.

Henderson's representations about African countries and governments' involvement with his joint venture were false and misleading because, when Henderson sent the June 2017 email,

there were no such agreements and Henderson was not aware of any. Id. at ¶¶ 48-49. Rather, Henderson later acknowledged that his statements as to the four African countries were only aspirational and not based in reality, and explained his representation regarding the Nigerian government as "a given in international business," which is not supported by any evidence in the record. Ibid. Henderson's representations regarding the Native American tribe were also false and misleading. In fact, Henderson learned between August and October 2017 that the tribe had not provided and would not be able to provide "$200 billion in gold bullion / hallmarked assets;" did not operate a "commercial bank" but merely owned a "defunct bank" that it hoped to turn into a "central bank;" and had not provided or promised a $250 million standby letter of credit. Id. at ¶¶ 52-53.

Henderson's misrepresentations regarding other sources of financial support were material, though not for the same reason as his misrepresentations about how investments would be used. They were material because Henderson used them to make his joint venture appear legitimate and well-funded, to make the investments look safe, and to persuade solicited individuals to invest. See SEC v. Randy, 38 F. Supp. 2d 657, 668-69 (N.D. Ill. 1999).

The undisputed facts and evidence also establish that Henderson employed a fraudulent scheme sufficient to satisfy the first element of the SEC's fraud claims. Specifically, as the SEC argues, Henderson fraudulently misappropriated $50,000 from Little and $10,000 from Alvino. To prove Henderson's liability for a fraudulent scheme, the SEC must show that Henderson: (1) committed a deceptive or manipulative act; (2) in furtherance of a scheme to defraud; (3) with scienter for SEC Rule 10b-5 or merely negligence for § 17(a)(3) of the Securities Act. See 17 C.F.R. §§ 240.10b-5(a) and (c) (Rule 10b-5); Bauer, 723 F.3d at 768 n. 2. Henderson engaged in deception by misrepresenting how he would use Little's and Alvino's investments and, instead,

converting those investments for his own use. See SEC v. Marshall, No. 2:17-cv-02189, 2020 WL 3047470, *3 (D. Nev. June 8, 2020); SEC v. Wilde, No. SACV 11-0315, 2012 WL 6621747, *5 (C.D. Cal. Dec. 17, 2012). Henderson compounded his deception as to Little when she followed up with Henderson in November 2017 by lying that he had used some of the money to secure a financial instrument needed for a crude oil transaction. Similarly, Henderson misrepresented to Alvino that he had "invested nearly a million to create this opportunity," though Henderson testified during the SEC's investigation that he had invested only $100,000 as of November 2018.

Those deceptions were indisputably in furtherance of Henderson's fraudulent scheme because Henderson's misappropriation was the scheme: Henderson's goal was to enrich himself by duping investors into believing their money would be used to finance crude oil transactions when, in reality, Henderson immediately used the investments for personal expenses. See SEC v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 392-93 (S.D.N.Y. 2014).

Having established that Henderson made material representations and omissions and employed a fraudulent scheme in connection with his offer and sales of securities, all that is left for the SEC to prove on its fraud claims is Henderson's intent: scienter for the SEC's Rule 10b-5 claim and negligence for the SEC's claim under § 17(a) of the Securities Act. Henderson's summary judgment motion generically argues that the SEC is not able to prove scienter as to the SEC's claim under § 17(a) of the Securities Act. Dkt. 73 at 3. But the SEC's § 17(a) claim does not require scienter, just negligence. Kameli, 276 F. Supp. 3d at 861-62. And Henderson does not make that argument as to the SEC's Rule 10b-5 claim. See Dkt. 73 at 1-2. Nevertheless, the Court concludes that the undisputed facts and evidence reveal that Henderson acted not just with negligence but with scienter.

"Scienter encompasses either a mental state embracing intent to deceive, manipulate or defraud, or reckless acts that are not merely simple or even inexcusable negligence, but an extreme departure from the ordinary standards of care, and that present a danger of misleading buyers and sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." SEC v. Ustian, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017) (cleaned up). Of course, neither the Court nor the SEC can read Henderson's mind, but scienter can be established through circumstantial evidence and "can be inferred from the nature and timing of defendant's knowing misrepresentations." SEC v. Cook, No. 1:13-cv-01312, 2015 WL 5022152, *20 (S.D. Ind. Aug. 24, 2015).

The undisputed facts and evidence show that Henderson intended to deceive and defraud. Henderson's representation that he would use investments to obtain financing instruments and facilitate crude oil transactions were outright lies. There is no evidence in the record that Henderson ever made any effort to obtain a financing instrument or to facilitate a crude oil transaction. Henderson and his company never completed a crude oil transaction and Henderson's company has never earned any revenue. Dkt. 70 at ¶ 15. Moreover, rather than use the investments he received from Little and Alvino as he represented, Henderson immediately misappropriated those funds to use for personal expenses—cash withdrawals, at restaurants and bars, on dental services, for shopping including at Costco and Neiman Marcus, on travel to the Turks and Caicos, Aruba, and Florida. Id. at ¶¶ 25-26, 62-64. And Henderson was not a pawn in a larger scheme, he was the only responsible party for the misrepresentations and fraudulent scheme. See SEC v. Milan Capital Grp., Inc., No. 00-cv-108, 2000 WL 1682761, *7 (S.D.N.Y. Nov. 9, 2000) ("the SEC has offered ample evidence that [the defendant] was at the center of the fraud").

Henderson also compounded his lies to Little when she followed up on her investment after the better part of a year. Henderson claimed to have used some of her investment to secure a financial instrument but that was a lie. Dkt. 70 at ¶¶ 28-29. And Henderson deferred the reality that he had squandered Little's investment on himself by continuing to represent to Little that she should still expect a return and convincing Little to agree to "parlay" her investment in exchange for a promise from Henderson and his company for $8 million in profits, even though Henderson's company is insolvent. Id. at ¶¶ 30-31.

Henderson's misrepresentations about financial commitments from a Native American tribe and several African countries and governments in his June 2017 email solicitation, which ultimately led to Alvino's $10,000 investment, also reveal deceptive intent or at least recklessness. Henderson has admitted that his representations that his joint venture's assets would be "monetized and matched" by four African countries were not true, but "aspirational," though that was concealed from Henderson's solicitation. Id. at ¶ 48. There is similarly no credible explanation in the record for Henderson's representation that the Nigerian government was obligated to provide sovereign funds—Henderson was not aware of any such agreement because there was none. Id. at ¶49. And Henderson's claim that such obligations are "a given in international business" in response to the SEC's requests for admission in this case does not create a triable issue of fact.

Henderson claims that his misrepresentations regarding the Native American tribe were made in reliance on information provided by his joint venture partner. But Henderson cannot avoid liability by claiming he relied on what his joint venture partner told him. See SEC v. Milan Grp. Inc., 962 F. Supp. 2d 182, 201 (D.D.C. 2013). And Henderson's representations were nevertheless at least reckless because he failed to conduct any due diligence to confirm the information. See SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 10 (D.D.C. 1998).

24

Last, the Court may draw an adverse inference against Henderson because he has invoked his Fifth Amendment right against self-incrimination, including at his deposition and in response to the SEC's motion for summary judgment, which reinforces the Court's conclusion that Henderson acted not just with negligence but with scienter. See LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 391 (7th Cir. 1995); SEC v. Monterosso, 756 F.3d 1326, 1336 n. 19 (11th Cir. 2014).

In his summary judgment motion, Henderson argues as to the SEC's fraud claims that the SEC has failed to prove damages. Dkt. 73 at 2-3. Further, Henderson attaches affidavits from Little and Alvino disclaiming that they suffered any harm or damages. Dkt. 73 at 12, 16-17. In response, the SEC notes that Henderson's motion does not comply with Local Rule 56.1 because he did not file a separate statement of facts. That is reason enough to deny Henderson's motion. But Henderson's argument also fails to support his motion or to provide a basis to deny the SEC's summary judgment motion. The SEC brought this action according to its authority under § 21(d) of the Exchange Act, which authorizes the SEC to bring an enforcement action "[w]henever it shall appear to the Commission that any person" has violated, is violating, or may violate federal securities laws. 15 U.S.C. § 78u(d). Unlike private litigants, the SEC is not required to prove that any investor relied on any misrepresentation or that any misrepresentation caused any investor to lose money. See SEC v. Teo, 746 F.3d 90, 102 (3d Cir. 2014).

Henderson's argument that Little and Alvino are not claiming any damages or harm may be relevant to the remedies that the SEC is entitled to on Henderson's liability for his violations of the securities laws. See Liu v. SEC, 140 S. Ct. 1936, 1947-49 (2020). And the SEC's statement of facts on its motion for summary judgment would appear to preclude it from seeking restitution or disgorgement from Henderson for Alvino's $10,000 investment because Henderson has paid it

back. Dkt. 70 at ¶ 72. But the SEC need not prove that any investor was damaged or harmed by his misrepresentations or fraudulent scheme for the Court to hold Henderson liable for his violations of the securities laws, so Henderson's arguments on that point are irrelevant for now.

Accordingly, the Court concludes that the undisputed evidence shows that Henderson is liable for violating SEC Rule 10b-5 implementing § 10(b) of the Exchange Act and § 17(a) of the Securities Act.

* * *

The undisputed facts and evidence show that there are no genuine issues of material fact that Henderson offered and sold securities using interstate facilities, including email, in the form of investment contracts, including to Little and Alvino, without filing a registration statement with the SEC. Henderson is therefore liable for violating § 5 of the Securities Act. Similarly, the undisputed facts and evidence show that there are no genuine issues of material fact that Henderson is liable for violating SEC Rule 10b-5 implementing § 10(b) of the Exchange Act and § 17(a) of the Securities Act. Henderson's offers and sales of securities, including to Little and Alvino, were based on knowing lies as part of a fraudulent scheme to obtain money that Henderson immediately used on himself and not to obtain financing instruments to facilitate crude oil transactions as he claimed. The SEC's motion for summary judgment is granted and Henderson's motion for summary judgment is denied.

**B. Defendant's motion for sanctions or involuntary dismissal with prejudice is denied.**

After briefing on the parties' motions for summary judgment was complete, Henderson filed a motion "for sanctions and/or for involuntary dismissal with prejudice and without leave to amend due to Plaintiff's commiting [sic] fraud upon the Court, abusive discovery practices, and/or

for Federal Rules of Civil Procedure 12(b)(6) and/or Rule 12(b)(7)." Dkt. 81, 83.[3] Henderson's blunderbuss motion repeatedly invokes rhetorical themes that the SEC failed to conduct a reasonable investigation before filing this case and has committed fraud on the Court and abusive discovery practices towards him in litigating this case. But those points are not supported by any facts or law.

Henderson's first overarching argument relates to his gripe that Little and Alvino disclaim any harm or damages. But, as explained above, the SEC need not plead or prove investor harm or damages in an enforcement action under § 21(d) of the Exchange Act. Rather, § 21(d) authorizes the SEC to bring an enforcement action "[w]henever it shall appear to the Commission that any person" has violated, is violating, or may violate federal securities laws. 15 U.S.C. § 78u(d). Thus, the SEC need only plead and prove a bare violation of the relevant federal securities laws and is not required to prove that any investor relied on any misrepresentation or that any misrepresentation caused any investor to lose money. See Teo, 746 F.3d at 102. Investor reliance, harm, or damages "have no relevance to the question of whether someone violated the law." Id. at 102-03. "Rather, SEC civil suits are described as promoting economic and social policies" and "the SEC pursues its claims independent of the claims of individual investors." Id. at 102 (cleaned up). In other words, as the SEC has consistently stressed, "'it is not a collection agency for defrauded investors.'" Ibid. (quoting George W. Dent Jr., Ancillary Relief in Federal Securities Law: A Study in Federal Remedies, 67 Minn. L. Rev. 865, 930 (1983)).

In granting the SEC's motion for summary judgment, above, the Court has ruled only that the undisputed facts and evidence reveal that there are no genuine issues of material fact that

---

[3] Henderson filed this motion twice, the first with about 450 pages of exhibits, Dkt. 81, and the second with only about 40 pages of exhibits, Dkt. 83. But the motions are identical, so the Court addresses both as one.

Henderson is liable for violations of federal securities laws. In its amended complaint, the SEC asks for permanent injunctions, disgorgement of all ill-gotten gains or unjust enrichment derived from the violations, and civil monetary penalties as remedies for Henderson's violations. Dkt. 32. The SEC is authorized by law to seek each of those remedies. See 15 U.S.C. § 77t (authorizing the SEC to seek injunctions and civil monetary penalties), § 78u(d) (authorizing the SEC to seek injunctions, disgorgement, and civil monetary penalties).

But the Court has not addressed the remedies to which the SEC is entitled for proving those violations because the SEC has not raised the issue. Henderson notes in his sanctions motion that he returned Alvino's $10,000 investment, Dkt. 83 at 6, which the SEC acknowledged in its statement of facts in support of its summary judgment motion, Dkt. 70 at ¶ 72. Thus, it appears that any claim by the SEC against Henderson for restitution or disgorgement of Alvino's investment is moot. More broadly, Henderson's argument that Little and Alvino are not claiming any damages or harm may be relevant to the remedies that the SEC is entitled to on Henderson's liability for his violations of the securities laws. See Liu, 140 S. Ct. at 1947-49. But that issue, as well as the SEC's entitlement to the other remedies the SEC seeks against Henderson for his violations, including an injunction and civil monetary penalties, remain to be decided.

Henderson's complaints in his sanctions motion about discovery issues are no more convincing. Henderson notes that the SEC chose not to ask Alvino whether he was an accredited investor at the time of his investment during Henderson's and its own deposition of Alvino. Dkt. 81 at 7. But Henderson does not explain why the SEC had any obligation to so inquire. And any argument by Henderson that Alvino or Little were accredited investors relates to an exemption from the registration requirement in § 5 of the Securities Act that is Henderson's burden to establish. Randy, 38 F. Supp. 2d at 667. Henderson's attempted invocation of any exemption is

28

too little, too late. Henderson forfeited any exemption argument by failing to raise it in response to the SEC's summary judgment motion or in support of his own. Even setting that aside, Henderson does not establish that either Alvino or Little were accredited investors.

Henderson's claims that he cured any registration deficiencies by filing, on June 11, 2021, a Form D for his 2016 and 2017 solicitations or that some of his expenditures of Little's investment were in furtherance of his business fail for similar reasons. Henderson forfeited any argument on those points by failing to raise them in the summary judgment briefing. And, notably, Henderson refused to answer any questions on them during his deposition, instead invoking his Fifth Amendment right against self-incrimination. "The Fifth Amendment privilege cannot be invoked to oppose discovery and then tossed aside to support a party's assertions." SEC v. Zimmerman, 845 F. Supp. 896, 899 (N.D. Ga. 1993). As to his claimed cure of registration deficiencies, Henderson produced nothing on the point during discovery and, on the merits, though Henderson attached as an exhibit to his sanctions motion a Form D that he had filled out, Dkt. 81 at 115-121, the SEC has certified that no such form was ever, in fact, filed, Dkt. 85-1.

Henderson also complains about the Court's rulings granting the SEC's discovery motions, and specifically requiring Henderson to produce documents he withheld as privileged work product. But the Court granted the SEC's motions on that point because the Court concluded that Henderson's work product objections were meritless. The SEC's discovery motions, therefore, could not be abusive discovery practices or frauds on the Court.

The final point that the Court will address on Henderson's sanctions motion is Henderson's argument that the case should be dismissed under Rule 12(b)(7) because the SEC failed to join Henderson's joint venture partner as a defendant. But, as the SEC explains, Henderson's argument is meritless. Henderson fails to establish that his joint venture partner is a necessary or an

indispensable party under Rule 19. See BCBSM, Inc. v. Walgreen Co., 512 F. Supp. 3d 837, 848

(N.D. Ill. 2021). And Henderson's joint venture partner is neither because this case is about

Henderson's failure to file registration statements and his deceptive scheme to misappropriate

investments for personal gain. Defendant's sanctions motion is denied.

## IV. CONCLUSION

The undisputed facts and evidence reveal that Henderson is liable for violations of §§ 5

and 17(a) of the Securities Act and SEC Rule 10b-5 implementing § 10(b) of the Exchange Act.

The SEC's summary judgment motion on those issues is granted. Henderson's motions for

summary judgment and for sanctions are denied. Because several issues in this case remain

unresolved, including the issue of what remedies the SEC is entitled to for Henderson's violations,

the parties shall file written status reports by April 5, 2022, that identify the remaining issues in

this case and propose a scheduling order for further dispositive motions or a trial date to resolve

those issues.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: March 17, 2022